UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| D.P., the parent and natural guardian of JOHN DOE 1, and JOHN DOE 2, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br> -against-<br><br>THE CITY OF NEW YORK; THE ADMINISTRATION FOR CHILDREN'S SERVICES; REBECCA JONES GASTON, Commissioner of ACS (in her official capacity); NANCY GINSBURG, Deputy Commissioner for the Division of Youth and Family Justice of ACS (in her official capacity),<br><br>     Defendants. | Case No. 26-cv-4745<br><br>**CLASS ACTION COMPLAINT**<br><br><u>Jury Trial Demanded</u> |

**"Children have a very special place in life which law should reflect."**

> *Eddings v. Oklahoma*, 455 U.S. 104, 116 n.12 (1982) (cleaned up) (quoting *May v. Anderson*, 345 U.S. 528, 536 (1953) (Frankfurter, J., concurring opinion)).

## PRELIMINARY STATEMENT

1. Last month, following a routine visit with his legal defense social worker at the Horizon Juvenile Center where JOHN DOE 1 resides, an officer ordered the 17-year-old to strip naked, bend over, and "crack your cheeks." The search was carried out pursuant to the written policies and procedures of the Administration for Children's Services ("ACS").

2. ACS policy mandates a strip search and visual body cavity inspection upon admission to secure detention, and then any time a resident has an in-person visit, even with a legal representative, before any court appearance, and *again* after a court appearance.

3.      These searches are done routinely, and without consideration of reasonable suspicion that the child possesses contraband. ACS's procedures require the child to be completely naked while their entire body is inspected, the inside of their mouth is checked, their hair is searched, and the space between their fingers and toes is checked. The children are told to move their genitals "left," "right," "up," "down," and "let it hang." They are also directed to squat and cough – unless there is a visual body cavity inspection, in which case, the children are told to bend over and spread their buttocks. There is no requirement in ACS's policy, nor is any effort made in practice, to provide children a robe or gown to safeguard their privacy during these searches.

4.      When JOHN DOE 1 protested the visual body cavity inspection,[1] ACS officers told him that if he did not comply, he would be denied phone calls and visitations with his lawyer and he would not be allowed to attend future court appearances. JOHN DOE 1 was held naked in front of the officers until he submitted to the visual body cavity inspection.

5.      JOHN DOE 2 resides in the same ACS facility as JOHN DOE 1. He has been routinely subjected to strip searches and visual body cavity inspections after visits, and before and after court appearances. In May 2026, JOHN DOE 2 was subjected to a strip search and visual body cavity inspection after a *virtual meeting*. There was no individualized suspicion that JOHN DOE 2 possessed contraband to justify these searches. Because of his

---

[1] "Various terms are used to describe the inspection of a naked body, and the terms are distinguished *by the degrees of intrusion involved* in the search for contraband. The term 'strip search' is used generally to describe any inspection of the naked body. An individual being strip searched may be required to move his body in various ways to permit a more complete inspection. A 'visual body-cavity search' is a strip search that entails the specific examination of the genitals and anus, without any bodily contact by the inspector." *Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 62 (2d Cir. 2009) (citations omitted) (emphasis added).

fear of being subjected to another visual body cavity search, JOHN DOE 2 told his parents to stop visiting him. He also refused to attend two subsequent court appearances and refused a virtual visit with his counselor.

6.      The experiences of JOHN DOE 1 and JOHN DOE 2 are common to the experiences of the hundreds of children, as young as 14, who reside in secure detention awaiting adjudication of their Family Court and criminal court cases. These search procedures are conducted pursuant to official ACS policy, which mandates strip searches, absent reasonable suspicion, before and after court appearances, and for visits (with no distinction between family visits and visits with legal representatives). ACS now routinely conducts these searches after *virtual* visits and court appearances for residents of Horizon.

7.      These repeated, post-admission, strip searches are unconstitutional.[2] In *N.G. ex rel. S.C. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004), the Second Circuit held that it violates the Fourth Amendment to strip search a juvenile detention resident, absent reasonable suspicion, merely because the resident is being transferred to court. (And that's even when the search is done *with* a robe and *without* a body cavity inspection.) This is because there is "no state interest sufficient to warrant repeated strip searches simply because of transfers to other facilities," such as, for a court appearance. 382 F.3d at 233-34.

8.      Despite this clearly established constitutional rule, ACS's written search policy *mandates* a suspicionless strip search *and* visual body cavity inspection every time a

---

[2] This case is not about searches performed upon admission to secure detention. Rather, it addresses strip searches and visual body cavity inspections performed absent individualized suspicion following admission. Nevertheless, ACS's admission search procedures raise serious constitutional concerns.

secure detention resident goes to *and* returns from court, which is precisely what the Second Circuit held is unconstitutional.

9.    In the past month, JOHN DOE 1 was subjected to a strip search with a visual body cavity inspection four times (and other strip searches without the visual body cavity inspection), all of which lacked reasonable suspicion. JOHN DOE 1 was subject to a visual body cavity inspection following a counsel visit and before going to court. ACS officers also searched JOHN DOE 1, and all the other residents of his housing hall, without individualized suspicion, subjecting them all to strip searches with visual body cavity inspections.

10.    In addition to violating the constitutional prohibition on unreasonable searches, ACS's search procedures interfere with the right to the assistance of counsel, to be present at every stage of a criminal case, and to familial association. By inflicting children with dehumanizing searches unsupported by reasonable suspicion anytime they meet with their attorney or a social worker, *or go to court*, or have a family member visit, ACS is interfering with the constitutional rights of these children to receive the assistance of counsel, to be confronted with the witnesses against them, and to see their families.

11.    These strip searches, and especially the visual body cavity inspections, are traumatic and harmful to children. The Second Circuit has recognized this harm: "since youth is a condition of life when a person may be most susceptible to psychological damage, children are especially susceptible to possible traumas from strip searches." *N.G.*, 382 F.3d at 233 (cleaned up). This trauma has already caused real harm. On May 15, 2026, after JOHN DOE 1 was unlawfully strip searched and made to bend over and spread his buttocks for a

visual body cavity inspection before he went to court, he attempted to end his life by hanging himself in a cell in the courthouse.

12.   This case is brought to stop ACS's unconstitutional search procedures. Plaintiffs seek a class-wide judgment declaring ACS's search policy and procedures unconstitutional. Plaintiffs also seek a class-wide injunction enjoining Defendants from continuing these procedures and directing Defendants to implement all necessary measures to ensure these procedures are not continued.

13.   This lawsuit also seeks damages for the many children ACS has unlawfully searched. Plaintiffs seek, on a class-wide basis and for themselves individually, compensatory damages commensurate with the injuries suffered, in amounts determined at trial, and the costs and expenses of this action.

## JURISDICTION AND VENUE

14.   Jurisdiction is conferred on this Court under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

15.   Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202; Rule 57 of the Federal Rules of Civil Procedure; and the Court's inherent equitable authority.

16.   This Court has supplemental jurisdiction under 28 U.S.C. § 1367 to hear Plaintiffs' state law claims.

17.   Venue is properly in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events alleged herein were committed within this district.

## JURY DEMAND

18.    Plaintiffs demand a trial by jury in this action on every one of their claims for which a jury trial is legally available.

## PARTIES

19.    Plaintiff D.R. is the parent and natural guardian of her minor child, JOHN DOE 1.

20.    JOHN DOE 1 is a minor currently detained in Horizon Juvenile Center, a juvenile facility operated by an agency of the City of New York.

21.    Plaintiff JOHN DOE 2 is currently detained in Horizon Juvenile Center, a juvenile facility operated by an agency of the City of New York; he was a minor when he initially entered the facility and for several months thereafter.

22.    Defendant the City of New York ("the City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain secure juvenile detention facilities, and it does so.

23.    Defendant the Administration for Children's Services ("ACS") is an agency of the City and is responsible for operating and maintaining the City's secure juvenile detention facilities, including Horizon Juvenile Center ("Horizon"), which is located in the Bronx, and Crossroads Juvenile Center ("Crossroads"), which is located in Brooklyn.

24.    The City and ACS assume the risks incidental to the maintenance of Horizon and Crossroads and the employment of staff who work at these facilities.

25.     Defendant REBECCA JONES GASTON is the Commissioner of ACS and Defendant NANCY GINSBURG is the Deputy Commissioner for the Division of Youth and Family Justice of ACS. They are sued in their official capacities.

26.     At all relevant times, Defendants JONES GASTON and GINSBERG were employed by the City and ACS.

27.     At all relevant times, Defendants JONES GASTON and GINSBERG acted under color of law in the course and scope of their duties and authority as officers, agents, servants, and employees of the City and ACS.

28.     Defendants JONES GASTON and GINSBERG are responsible for ACS's policies and procedures in ACS secure detention facilities.

FACTS

A.     ACS Secure Detention Facilities

29.     "ACS operates two secure detention facilities: Crossroads Juvenile Center in Brownsville, Brooklyn and Horizon Juvenile Center in the Mott Haven section of the South Bronx."[3]

30.     The residents of ACS secure detention facilities are as young as 14 years old, and in rare cases, 13-year-olds may be placed in ACS secure detention.

31.     The children who reside at ACS secure detention facilities include children who have pending criminal charges, as well as children who have delinquency cases pending in Family Court.

---

[3]     Admin. for Children's Servs., NYC Children, "Secure Detention," *at* http://nyc.gov/site/acs/justice/secure-detention.page.

32. Defendants JONES GASTON and GINSBURG are responsible for overseeing ACS secure detention facilities.

**B.      ACS Secure Detention Search Policy and Procedures**

33.    The following ACS policies and procedures are referred to in this Complaint as "ACS's search procedures."

34. Defendants JONES GASTON and GINSBURG are responsible for overseeing, enforcing, and implementing the search policies and procedures adopted and utilized by ACS at its secure detention facilities.

35. ACS maintains a written search policy, ACS Policy 2018/06, entitled, "Control of and Search for Contraband in Secure and Specialized Secure Detention Facilities."

36. A true and correct copy of ACS Policy 2018/06 is attached as Exhibit 1.

37. Policy 2018/06 was approved by the ACS Commissioner.

38. Policy 2018/06 mandates a "strip search" in the following situations:

   a. Upon admission of an alleged or convicted felony offender.

   b. Upon return and re-entry of the youth to the facility when the youth has been out of the custody or supervision of ACS or DOC, such as during a court appearance or an off-site medical visit.

   c. Following a visit at a facility between a youth and any outside visitor.

Ex. 1 at 7-8.[4]

---

[4] Policy 2018/06 also requires a strip search "[w]hen there is reasonable suspicion that a youth in the facility is in possession of contraband," but this case does not address those searches.

39.    Policy 2018/06 defines "strip search" to include a visual body cavity inspection and "may require the youth to lift the breasts and/or scrotum":

> A strip search is a visual inspection of the youth's clothing and unclothed body. During a strip search, the following may be inspected: armpits, inside of the mouth (mouth search), ears, nose, navel, hair (and beard), bottoms of feet, and between fingers and toes. This includes a visual inspection of the youth's buttocks area after the youth has been directed to separate the muscles of the buttocks while standing with his/her legs spread and body bent forward at the waist. A strip search may require the youth to lift the breasts and/or scrotum.

*Id.* at 7.

40.    Policy 2018/06 does not require a gown or robe to be provided to the child during a strip search; there is mention elsewhere in the policy of a "gown search" but that procedure is not utilized during a "strip search."

41.    When performing a strip search in secure detention, ACS has followed these procedures for many years:

    a.    the child is required to fully disrobe so they are completely naked;

    b.    the child's entire naked body is then inspected, including inside their mouth, between their fingers and toes, behind their ears, and their hair;

    c.    male residents are then directed to use their hand to move their genitals "left," "right," "up," "down," and "let it hang"; and

    d.    they are ordered to squat and cough.

42.    They must do all of this while completely naked.

43.    ACS does not provide a gown or robe or towel for the child to cover any part of their body for privacy during any part of the search.

44. Beginning in April 2026, ACS began subjecting children to visual body cavity inspections as part of the strip search procedures at the Horizon Juvenile Facility.

45. These searches require the child, in place of the squat and cough procedure, to stand with their legs apart, bend over, and spread their buttocks to expose their anus for visual inspection by an ACS staff member.

46. Children in ACS secure custody are subjected to a full strip search, absent individualized suspicion, upon admission and periodically throughout their custody.

47. Specifically, ACS Policy 2018/06 requires a strip search after admission, regardless of reasonable suspicion: "[u]pon return and re-entry of the youth to the facility when the youth has been out of the custody or supervision of ACS or DOC, *such as during a court appearance* or an off-site medical visit"; and "[f]ollowing a visit at a facility between a youth and any outside visitor." Ex. 1 at 7-8 (emphasis added).

48. ACS has two other written policies – ACS Division of Youth and Family Justice (DYFJ) Operations Order 2023/05 ("Operations Order 2023/05") and ACS Policy 2023/05 – that require strip searches of secure detention residents absent reasonable suspicion.

49. A true and correct copy of Operations Order 2023/05 is attached as Exhibit 2.

50. A true and correct copy of ACS Policy 2023/05 is attached as Exhibit 3.

51. Operations Order 2023/05, entitled "Enhanced Search Procedures for Arriving and Departing Youth," requires a strip search, regardless of reasonable suspicion, for "[a]ll youth departing from and returning to" an ACS secure detention facility. Ex. 2 at 2.

52. Operations Order 2023/05 was approved by Defendant GINSBERG.

53. Operations Order 2023/05, like Policy 2018/06, defines "strip search" to include a visual body cavity inspection and "may require the youth to lift the breasts and/or scrotum." Ex. 2 at 2 n.1.

54. Operations Order 2023/05 does not define "departing from" or "returning to" an ACS secure detention facility but the "Secure Detention Strip Search Form" annexed to the order provides six check boxes for "Reason for Strip Search:" "New Admit," "Court Departure," "Return from Court," "Transfer," "Release," and "Unannounced." Ex. 2.

55. A true and correct copy of ACS's "Secure Detention Strip Search Form" is included in Exhibit 2 as "Attachment A" to Operations Order 2023/05.

56. ACS Policy 2023/05, entitled "Transporting Youth in Secure and Specialized Secure Detention," also requires strip searches going to and coming back from court.

57. Policy 2023/05 was approved by the ACS Commissioner.

58. In setting out "Search Procedure[s]," Policy 2023/05 expressly incorporates Policy 2018/06 and Operations Order 2023/05, *see* Ex. 3 at 7 nn.15 & 16; it also includes as "Attachment F" the same "Secure Detention Strip Search Form" attached to Operations Order 2023/05.

59. Policy 2023/05 requires strip searches for "transports," which include "court appearances," and "transfers," which include "inter-facility transfer[s]" and "[a]ny time youth are being transferred or otherwise transported to a new facility." Ex. 3 at 2, 7, 11.

60. Policy 2023/05 requires the strip search coming to and going back from a court appearance and other transports: "At departure, each youth must receive a routine strip

search . . . . Youth must also receive a routine strip search upon their return to the facility."
Ex. 3 at 7.

62.     The strip searches required by Policy 2023/05 are *in addition to* searches with a metal detector, a transfrisker (a cellular device detector), and a Body Orifice Security Scanner ("BOSS chair"). Ex. 3 at 7-8.

62.     "The BOSS chair is a non-intrusive, high sensitivity detector designed to detect metal objects hidden in body cavities. It is used to screen inmates for weapons and contraband objects that might be hidden in anal, oral, vaginal, and nasal cavities." *Dodge v. Cnty. of Orange*, 282 F. Supp. 2d 41, 53 (S.D.N.Y. 2003).

63.     Policy 2023/05 requires youth to be under constant supervision when they are transported to or from court, or between facilities. Ex. 3 at 4-8, 14-16.

64.     Defendants JONES GASTON and GINSBURG are responsible for overseeing, enforcing, and implementing the search policies and procedures adopted and utilized by ACS at its secure detention facilities.

**B.     Contraband in ACS secure detention facilities**

65.     ACS is primarily to blame for the presence of contraband in ACS secure detention facilities.

66.     In 2024, five ACS Youth Development Specialists were charged in federal court with smuggling weapons, drugs, and other contraband into Crossroads.[5]

---

[5] *See* U.S. Atty's Office, Press Release, "Five Employees of Juvenile Detention Center Charged With Smuggling Contraband in Exchange for Bribes," https://www.justice.gov/usao-edny/pr/five-employees-juvenile-detention-center-charged-smuggling-contraband-exchange-bribes.

67.    One of the defendants, Da'Vante Bolton, "smuggled in razor blades and marijuana" and "pleaded guilty to accepting bribes, admitting that he smuggled contraband into a juvenile detention facility."[6] Three of the other defendants pled guilty as well.

68.    Soon after, in April 2025, the New York State Comptroller's Office issued a report finding there was "[i]nsufficient prevention of contraband entering [secure ACS detention] facilities."[7]

69.    A key finding of the report is that ACS has failed to adequately detect contraband entering the facilities:

> Contraband entering facilities is the second highest reported incident category and increased over the scope of our audit period, indicating that procedures for the prevention of contraband are insufficient or are being insufficiently monitored. The number of reported contraband incidents increased from 62 in 2019 to 706 in 2023—over a 1,038% increase. Weaknesses in enforcement of ACS policies may have contributed to the growth of this problem. For instance, cell phones are considered contraband. Despite an ACS policy prohibiting employees from bringing their personal cell phones into the facilities, we observed an ACS official who went through the security scanner at Horizon with two cell phones. Although the cell phones were visible to security officials, she was not told to take them back to her locker as others are told to do.

70.    The report further confirms that contraband is entering the facilities through ACS staff: "We asked ACS officials how contraband gets into the facilities. In response, a supervisor stated that staff bring in contraband . . . ."

---

[6] *See* U.S. Atty's Office, Press Release, "Four Employees of Juvenile Detention Center Plead Guilty to Taking Bribes," https://www.justice.gov/usao-edny/pr/four-employees-juvenile-detention-center-plead-guilty-taking-bribes.

[7] Office of the N.Y. State Comptroller, Div. of State Gov't Accountability, "Oversight of Horizon and Crossroads Juvenile Centers," Report 2022-N-3 (April 2025), *available at* https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2025-22n3.pdf.

71.     The Comptroller's findings corroborate news reports about staff smuggling contraband into ACS facilities.[8]

**D.    Experience of JOHN DOE 1**

72.     JOHN DOE 1 is 17 years old. He has resided in ACS secure detention facilities since he was 15 years old.

73.      When he first entered ACS secure detention, JOHN DOE 1 went through a full strip search: he had to take off all his clothes, so he was completely naked; his whole body was inspected, including his mouth and ears; the space between his fingers and toes was checked, as was his hair; and he had to squat and cough. JOHN DOE 1 was not offered a gown or robe to cover up; he had to stay naked throughout the search.

74.     Since then, JOHN DOE 1 has been subjected to strip searches – and visual body cavity inspections – that were not based on individualized suspicion that he possessed contraband.

75.     At various times when JOHN DOE 1 resided at Crossroads, he was subjected to a strip search without individualized suspicion that he possessed contraband.

---

[8] *See, e.g.*, Jorge Fitz-Gibbon, "Youth counselor took $70K in bribes to sneak drugs, blades into NYC juvenile detention facility: investigators," *N.Y. Post* (Oct. 30, 2025), *at* https://nypost.com/2025/10/30/us-news/youth-counselor-took-bribes-to-sneak-drugs-blades-into-juvenile-detention-facility-investigators/; Bahar Ostadan, "Brooklyn juvenile jail guard arrested for smuggling in cellphones, SIM cards," *Gothamist* (Feb. 21, 2024), *at* https://gothamist.com/news/brooklyn-juvenile-jail-guard-arrested-for-smuggling-in-cellphones-sim-cards; Bahar Ostadan, "Drugs, cash and razor blades flow into NYC juvenile centers through staff smuggling network," *Gothamist* (Mar. 15, 2023), *at* https://gothamist.com/news/drugs-cash-and-razor-blades-flow-into-nyc-juvenile-centers-through-staff-smuggling-network ("Drugs, cash and razor blades are flowing into the city's juvenile detention centers through a network of employees supplying teenagers with contraband, according to current and former employees.").

76.     Those searches did not involve a visual body cavity inspection but required JOHN DOE 1 to take off all his clothes so he was completely naked and then his whole body was inspected, including inside his mouth, behind his ears, between his fingers and toes, and his hair. JOHN DOE 1 also had to squat and cough.

77.     During these strip searches, JOHN DOE 1 was not offered a gown or robe to protect his privacy.

78.     On or about April 17, 2026, while residing at Horizon, JOHN DOE 1 was subjected to a strip search and visual body cavity inspection following a *virtual* visit with his attorney from The Legal Aid Society.

79.     The search involved the same procedures as past strip searches, but instead of being ordered to squat and cough, JOHN DOE 1 was told to bend over, spread his buttocks and expose his anus for inspection by the ACS officer.

80.     That search was conducted without individualized suspicion that JOHN DOE 1 possessed contraband.

81.     On May 7, 2026, after JOHN DOE 1 finished an in-person visit at Horizon with his Legal Aid Society social worker, ACS officers subjected JOHN DOE to a strip search and the officers again told him to bend over and "crack your cheeks," meaning he had to spread his buttocks to expose his anus for inspection.

82.     There was no individualized suspicion that JOHN DOE 1 was in possession of contraband when this strip search and visual body cavity inspection was conducted.

83. When JOHN DOE 1 protested spreading his buttocks for inspection, ACS officers told him that if he did not comply, he would be denied phone calls and visitations with his lawyer and would not be allowed to attend future court appearances.

84. JOHN DOE 1 was held naked in front of ACS officers for a substantial amount of time until he capitulated and was subjected to a humiliating visual body cavity inspection.

85. A week later, on May 12, 2026, ACS officers conducted strip searches with visual body cavity inspections of all the residents in JOHN DOE 1's hall.

86. There was no individualized suspicion that the residents of JOHN DOE 1's hall possessed contraband when these searches were conducted.

87. Everyone in JOHN DOE 1's hall was made to strip naked and spread their buttocks for visual inspection by ACS officers.

88. When JOHN DOE 1 objected to being ordered to spread his buttocks, an ACS officers told him that if he refused, they would not give him his clothing back.

89. Two days later, on May 15, 2026, before JOHN DOE 1 left for court, he was strip searched and forced to spread his buttocks for a visual inspection of his anus.

90. There was no individualized suspicion or reason to believe that a visual body cavity search of JOHN DOE 1 would locate contraband on May 15, 2026.

91. All the searches of JOHN DOE 1 described above were conducted pursuant to ACS's search policies and procedures.

92. ACS's unconstitutional and humiliating searches of JOHN DOE 1 and other juveniles like him in ACS secured detention has caused deep psychological harm.

93.    On May 15, 2026 – after JOHN DOE 1 was unlawfully strip searched and made to expose his anus for a visual inspection before leaving for a court appearance – JOHN DOE 1 attempted to end his life by hanging himself in a cell in the courthouse.

94.    On May 20, 2026, after JOHN DOE 1 was visited by his lawyers and father, he was subjected to a strip search.

95.    JOHN DOE 1's next court appearance is June 9, 2026, and he is terrified that he will be strip searched and forced to spread his buttocks for an officer if he attends that court appearance.

E.    Experience of JOHN DOE 2

96.    JOHN DOE 2 is now 18 years old, but he arrived at Horizon in December 2025 when he was still a minor.

97.    When JOHN DOE 2 was admitted to Horizon, he underwent a full strip search: he had to undress completely and his clothes were checked; the inside of his mouth was inspected, and his hair and the space between his toes was checked; he had to squat and was told to move his genitals "left," "right," "up," "down," and "let it hang."

98.    JOHN DOE 2 had to remain completely naked during this process; he was not offered a gown or robe to wear.

99.    While residing at Horizon, JOHN DOE 2 has been subjected to regular strip searches and, more recently, visual body cavity inspections, that were not based on individualized suspicion that he possessed contraband.

100.    During the strip searches, ACS officers order JOHN DOE 2 to get completely naked and they check his clothing; they look inside his mouth, through his hair, and

17

between his toes; he is told to move his genitals left, right, up, down, and "let it hang"; and he is ordered to squat.

101.    He must stay completely naked during these searches and has never been offered a gown or robe or even a towel to cover himself.

102.    These searches take two to three minutes.

103.    After JOHN DOE 2 was admitted to ACS secure detention, his parents visited him regularly until April 2026.

104.     In April 2026, when his mother visited, JOHN DOE 2 was subjected to a strip search that included a visual body cavity inspection after her visit.

105.    The strip search required JOHN DOE 2 to get fully undressed, have his clothes searched and his whole body inspected, including his mouth; the visual body cavity inspection involved an ACS officers demanding that JOHN DOE 2 bend over (while he was naked) and spread his buttocks so his anus could be inspected.

106.    There was no individualized suspicion that JOHN DOE 2 possessed contraband to justify these searches.

107.    After that visit, JOHN DOE 2 told his parents not to come visit him in-person because he did not want to be subjected to these humiliating search procedures.

108.     After ACS started the visual body cavity inspections, JOHN DOE 2 refused to go to court because he was humiliated by the searches and wanted to avoid them.

109.     JOHN DOE 2 has missed two court appearances because of these invasive ACS searches.

110.    In May, JOHN DOE 2 was subjected to visual body cavity inspection after a *virtual* meeting.

111.    Since then, he refused a virtual visit with his social worker because he did not want to have to go through that search.

112.    That search was conducted absent individualized suspicion that JOHN DOE 2 possessed contraband.

113.    The foregoing searches of JOHN DOE 2 were conducted pursuant to ACS's search policies and procedures.

**F.    Experience of John Doe 3**

114.    John Doe 3 is a 17-year-old resident of Crossroads. He is a class member, but not a class plaintiff.

115.    John Doe 3 has resided at Crossroads since April 2026.

116.    John Doe 3 has been subjected to a strip search when he leaves the facility to attend court *and* when he returns to the facility following the court appearance.

117.    There has been no individualized suspicion to justify these searches before and after attending court appearances.

118.    John Doe 3 has also been subjected to a strip search after in-person family visits.

119.    There has been no individualized suspicion to justify these searches following family visits.

120.    During the past month at Crossroads, John Doe 3 and all the residents of his hall were collectively strip searched.

121.    There was no individualized suspicion to justify the searches of John Doe 3 and all the residents of his hall.

122.    The foregoing searches of John Doe 3 were conducted pursuant to ACS's search policies and procedures.

### G.    Experience of John Doe 4

123.    John Doe 4 currently resides at Crossroads but spent more than a year as a resident of Horizon. He is a class member, but not a named plaintiff.

124.    During the time that John Doe 4 was a resident of Horizon, he was subjected to a strip search and visual body cavity inspection absent individualized suspicion.

125.    John Doe 4 was subjected to a strip search and visual body cavity inspection when he left the facility to attend court *and* when he returned to the facility following the court appearance.

126.    There was no individualized suspicion to justify these searches.

127.    Because of the unwarranted invasion of these searches, John Doe 4 refused to attend a court appearance in May 2026.

128.    John Doe 3 was subjected to a strip search and visual body cavity inspection multiple times at Horizon after a *virtual* visit.

129.    There was no individualized suspicion to justify these searches.

130.    The foregoing searches of John Doe 4 were conducted pursuant to ACS's search policies and procedures.

## H.     Experience of John Doe 5

131.    Until recently, John Doe 5 resided at Horizon. He is a class member, but not a named plaintiff.

132.    During that time, John Doe 5 was 15 years old.

133.    While he was a resident of Horizon, John Doe 5 was subjected to strip searches and visual body cavity inspections absent individualized suspicion.

134.    John Doe 5 was subjected to a strip search and visual body cavity inspection when he left the facility to attend court *and* when he returned to the facility following the court appearance.

135.    John Doe 5 was also subjected to a strip search and visual body cavity inspection when he was transferred from Horizon to Crossroads.

136.    There was no individualized suspicion to justify this search.

137.    The foregoing searches of John Doe 5 were conducted pursuant to ACS's search policies and procedures.

## I.     The harm caused by these strip searches

138.    Strip searches – especially when accompanied by a visual body cavity inspection – are traumatic and harmful to children.[9]

---

[9] *Mashburn v. Yamhill Cnty.*, 698 F. Supp. 2d 1233, 1235 (D. Or. 2010) (a child has a "more acute vulnerability to the intrusiveness of a strip search" than does an adult); *Jenkins v. Talladega City Bd. of Educ.*, 95 F.3d 1036, 1044 (11th Cir. 1996) ("[T]he perceived invasiveness and physical intimidation intrinsic to strip searches may be exacerbated for children."); *Flores v. Meese*, 681 F. Supp. 665, 667 (C.D. Cal. 1988) ("**Children are especially susceptible to possible traumas from strip searches.**" (emphasis added)).

139.     The Second Circuit has recognized this harm: "since youth is a condition of life when a person may be most susceptible to psychological damage, children are especially susceptible to possible traumas from strip searches."[10]

140.     Supreme Court Justice Stephen Breyer has recognized this harm: "Even when carried out in a respectful manner, and even absent any physical touching, such searches are inherently harmful, humiliating, and degrading."[11]

141.     Justice Sonia Sotomayor has recognized that strip searching a child is "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission."[12]

142.     As described by JOHN DOE 1: "I want these searches to stop. They make me feel awful about myself. They are humiliating and traumatic."

143.     According to JOHN DOE 2: "I want them to stop searching us like this all the time, especially the part where they make us bend over and spread our buttocks. It's awful and humiliating. I feel degraded and worthless when they make me expose my entire body and private parts to a stranger. . . . I want to be able to have my family come visit me and talk to my lawyers and go to court without having to go through this humiliation."

144.     Rebecca Heinsen is an attorney with The Legal Aid Society's Adolescent Intervention and Diversion Project who regularly represents youth who reside in secure detention. She has this to say about ACS's search procedures: "I am horrified by ACS's policy

---

[10] *N.G.*, 382 F.3d at 233 (cleaned up).

[11] *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 345 (2012) (Breyer, J., dissenting).

[12] *N.G.*, 382 F.3d at 239 (Sotomayor, J., concurring and dissenting in parts) (cleaned up).

of routinely conducting strip searches and visual body cavity inspections of my clients. These searches are traumatic, especially to children, and they interfere with my ability to represent my clients and communicate freely with them, which is a necessary part of assisting in their defense."

145.    Hillary Chernow, a Mitigation Specialist with The Legal Aid Society's Adolescent Intervention and Diversion Project reports: "These search procedures interfere with our client's ability to communicate with us and our ability to communicate with them."

146.    Residents in Horizon are being bullied by their peers for allowing themselves to be subject to visual body cavity inspections. This puts additional pressure on Plaintiffs and class members to refuse counsel visits and court appearances, beyond the embarrassment and humiliation that comes with being subjected to these searches.

147.    Children in ACS custody frequently have experiences of abuse and trauma that make them particularly vulnerable to the psychological harm of an invasive strip search.[13]

148.    According to Ms. Chernow: "As a licensed clinical social worker who has spent years working with juveniles and adolescents, I am deeply troubled that ACS routinely conducts strip searches and visual body cavity inspections of juvenile residents. These searches are psychologically traumatic and harmful, particularly to children."

---

[13] See Meg Gould, Cruel and Unusual Trauma: How Eighth Amendment Principles Governing Conditions of Confinement Should Apply to Juvenile Strip Searches, 52.2 COL. HUMAN RIGHTS L. REV. 1009, 1016 & n.26 (2021) ("When children first enter a juvenile detention facility, they most likely have already been exposed to many forms of traumatic violence." (citing a U.S. DOJ report from the National Task Force on Children Exposed to Violence discussing a study that found 90% of the youth in a Cook County, Illinois, detention center reported having been exposed to traumatic violence).

149. Yusuf El Ashmawy is an experienced criminal defense attorney who regularly represents children in ACS secure detention. According to Mr. El Ashmawy: "In my experience, the children in ACS secure detention are especially vulnerable. . . . Many have had life experiences that include significant trauma, abuse, and/or neglect. Routinely subjecting these children to traumatic and highly intrusive strip searches and visual body cavity inspections is, in my view, cruel, unnecessary and an unwarranted invasion of their privacy."

150. To stop this harm from continuing, ACS's unconstitutional search procedures must be enjoined.

## CLASS ACTION ALLEGATIONS

151. Plaintiffs seek to represent a certified class pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure consisting of all persons who have been or will be subjected to ACS's search procedures.

152. The members of the class are so numerous as to render joinder impracticable.

153. Upon information and belief, there are more than one hundred residents of ACS secure detention facilities who are impacted by ACS's search procedures who would be members of the class.

154. Upon information and belief, members of the class who would otherwise attend meetings with their attorneys, social workers, and court appearances, have refrained from doing so or refused out of fear of being subjected to ACS's search procedures.

155.    Upon information and belief, members of the class who would otherwise visit with their family members have refrained from doing so or refused out of fear of being subjected to ACS's search procedures.

156.    Upon information and belief, many class members who have been subjected to ACS's search procedures do not bring individual claims for fear of retaliation.

157.    The class members' claims share common questions of law and fact, including, but not limited to:

a.    Whether ACS and ACS officials have adopted policies, procedures, practices, and/or customs of subjecting residents of ACS secure detention facilities to strip searches absent individualized suspicion following admission into ACS secure detention;

b.    Whether ACS and ACS officials have adopted policies, procedures, practices, and/or customs of subjecting residents of Horizon to visual body cavity searches absent individualized suspicion following admission into ACS secure detention; and

c.    Whether these policies, procedures, practices, and/or customs violate the First, Fourth, Sixth, and/or Fourteenth Amendments of the United States Constitution.

158.    Plaintiffs' claims are typical of those of the class.  Like the other members of the class, Plaintiffs have been subjected to ACS's search procedures.

159.    The legal theories under which Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by Plaintiffs are typical of the harms suffered by the class members.

160.    Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the class, and will fairly and adequately protect the interests of the class.

161. Plaintiffs are residents of Horizon who have been, and will continue to be, victims of ACS's search procedures.

162. Plaintiffs are represented by Joshua S. Moskovitz and Rob Rickner, the managing principals of Rickner Moskovitz LLP.

163. Mr. Moskovitz and Mr. Rickner are experienced civil rights attorneys who have litigated several class action lawsuits.

164. Most recently, Mr. Moskovitz was approved lead class counsel in *Sughrim v. State of New York*, No. 19-cv-7977 (S.D.N.Y.), a class action that resulted in a stipulated judgment modifying the State of New York's policy for granting reasonable accommodations for correction officers to wear beards based on their religious beliefs.

165. Mr. Rickner was approved, along with Mr. Moskovitz, as class counsel in *Sierra v. City of* New York, Nos. 20-cv-10291, 20-cv-10541 (S.D.N.Y.), on behalf of protestors kettled in Mott Haven on June 4, 2020. Mr. Rickner is also class counsel in a case challenging racially biased arrests for marijuana.

166. Plaintiffs' attorneys have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

167. A declaratory judgment and injunction class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate.

168.     A damages class should be certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**FIRST CAUSE OF ACTION**
*Unreasonable Searches*
**In Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution**

169.     Plaintiffs reallege every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

170.     Plaintiffs and other members of the class have a Fourth Amendment right to be free from unreasonable searches, made applicable to the City and ACS through the Fourteenth Amendment.

171.     Strip searches, both with and without visual body cavity inspections, conducted after admission to a detention facility and without individualized suspicion that the search will uncover contraband, are unreasonable and violate the Fourth Amendment.

172.     ACS has adopted policies, procedures, practices, and/or customs of strip-searching children residing in ACS secure detention facilities absent individualized suspicion after admission.

173.     These policies, procedures, practices, and/or customs are the moving force of the unconstitutional searches that Plaintiffs and other members of the class have suffered.

174.     Plaintiffs and other members of the class have suffered and will continue to suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined to stop ACS's unconstitutional search policies and procedures.

175.    Plaintiffs and other members of the class have suffered compensable injuries from the unconstitutional searches they have endured, for which the City and ACS are liable under 42 U.S.C. § 1983 and *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).

SECOND CAUSE OF ACTION
*Interference with the Right to Counsel*
In Violation of the Sixth and Fourteenth Amendments to the U.S. Constitution

176.    Plaintiffs reallege every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

177.    Plaintiffs and other members of the class have a Sixth Amendment right to counsel, made applicable to the City and ACS through the Fourteenth Amendment.

178.    ACS has adopted policies, procedures, practices, and/or customs of strip-searching and, at times, conducting visual body cavity searches of residents of ACS secure detention facilities without reasonable suspicion before and/or after residents visit with their defense attorneys and other members of their legal defense team, including social workers and educators.

179.    ACS has applied these policies, procedures, practices, and/or customs at times to *virtual* visits between residents of ACS secure detention facilities and their legal defense team, including social workers and educators.

180.    These policies, procedures, practices, and/or customs interfere with the Sixth Amendment right to counsel of Plaintiffs and other members of the class.

181.    These policies, procedures, practices, and/or customs are the moving force of the interference with the right to counsel that Plaintiffs and other members of the class have suffered.

182.    Plaintiffs and other members of the class have suffered and will continue to suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined to stop ACS's unconstitutional search policies and procedures.

183.    Plaintiffs and other members of the class have suffered compensable injuries from the unconstitutional searches they have endured, for which the City and ACS are liable under 42 U.S.C. § 1983 and *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).

THIRD CAUSE OF ACTION
*Interference with the Right to be Present in Court at Every Stage of a Criminal Case*
In Violation of the Sixth and Fourteenth Amendment to the U.S. Constitution

184.    Plaintiffs reallege every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

185.    Plaintiffs and other members of the class have a right to be present in court at every stage of a criminal case protected by the Sixth and Fourteenth Amendments.

186.    ACS has adopted policies, procedures, practices, and/or customs of strip-searching and, at times, conducting visual body cavity searches of residents of ACS secure detention facilities without reasonable suspicion before *and* after residents attend court appearances.

187.    These policies, procedures, practices, and/or customs interfere with the constitutional right to be present in court at every stage of a criminal case that Plaintiffs and other members of the class are entitled to.

188.    These policies, procedures, practices, and/or customs are the moving force of the interference with the right to be present in court at every stage of a criminal case that Plaintiffs and other members of the class have suffered.

189.    Plaintiffs and other members of the class have suffered and will continue to suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined to stop ACS's unconstitutional search policies and procedures.

190.    Plaintiffs and other members of the class have suffered compensable injuries from the unconstitutional searches they have endured, for which the City and ACS are liable under 42 U.S.C. § 1983 and *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978)..

**FOURTH CAUSE OF ACTION**
*Interference with Familial Association*
**In Violation of the First and Fourteenth Amendments to the U.S. Constitution**

191.    Plaintiffs reallege every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

192.    Plaintiffs and other members of the class have a First and Fourteenth Amendment right to familial association.

193.    ACS has adopted policies, procedures, practices, and/or customs of strip-searching and, at times, conducting visual body cavity searches of residents of ACS secure detention facilities without reasonable suspicion before and/or after they visit with family members.

194.    These policies, procedures, practices, and/or customs interfere with the First Amendment and Fourteenth Amendment right of Plaintiffs and other members of the class to familial association.

195.    These policies, procedures, practices, and/or customs are the moving force of the interference with the right to familial association that Plaintiffs and other members of the class have suffered.

196.    Plaintiffs and other members of the class have suffered and will continue to suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined to stop ACS's unconstitutional search policies and procedures.

197.    Plaintiffs and other members of the class have suffered compensable injuries from the unconstitutional searches they have endured, for which the City and ACS are liable under 42 U.S.C. § 1983 and *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).

**WHEREFORE**, Plaintiffs, on behalf of themselves and other members of the class they seek to represent, respectfully request that this Court:

(A)    enter an order certifying this action as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure in the manner described above herein, with Plaintiffs as the class representatives;

(B)    issue a class-wide declaratory judgment pursuant to Fed. R. Civ. P. 57 that ACS's unconstitutional search policies and procedures violate the First, Fourth, Sixth, and Fourteenth Amendments of the United States Constitution;

(C)    issue a class-wide injunction enjoining Defendants from continuing ACS's unconstitutional search policies and procedures and ordering Defendants to implement concrete steps to ensure these policies and procedures end;

(D)    award Plaintiffs and other members of the class compensatory damages in an amount that is fair, just, and reasonable, to be determined at trial;

(E)    award reasonable attorneys' fees and costs; and

(F)    grant such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated:   June 5, 2026
         New York, New York

RICKNER MOSKOVITZ LLP
14 Wall Street, Suite 4C
New York, New York 10005
(212) 300-6506

Joshua S. Moskovitz
Rob Rickner
Josh@RMcivilrights.com
Rob@RMcivilrights.com

*Attorneys for Plaintiffs*
*and the putative class*

32