UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| D.P., et al.,<br><br>                    Plaintiffs,<br><br>            -v.-<br><br>THE CITY OF NEW YORK, et al.,<br><br>                    Defendants. | 26 Civ. 4745 (JHR)<br><br><u>OPINION & ORDER</u> |

JENNIFER H. REARDEN, District Judge:

Before the Court is Plaintiffs' motion for a temporary restraining order, ECF No. 3, as modified by Plaintiffs' letter dated June 15, 2026, ECF No. 52.  Plaintiffs D.P. (the parent and natural guardian of JOHN DOE 1) and JOHN DOE 2, on behalf of themselves and all others similarly situated, seek to enjoin Defendants the City of New York; the Administration for Children's Services ("ACS"); Rebecca Jones Gaston, Commissioner of ACS (in her official capacity); and Nancy Ginsburg, Deputy Commissioner for the Division of Youth and Family Justice of ACS (in her official capacity), from conducting the following searches on ACS "secure detention resident[s]," ECF No. 10 ¶ 8, "absent reasonable suspicion": (1) strip searches and visual body cavity inspections after counsel visits; (2) strip searches and visual body cavity inspections after virtual visits; (3) visual body cavity inspections after family visits; and (4) visual body cavity inspections upon returning from court, ECF No. 52.  For the following reasons, Plaintiffs' motion is denied.

### BACKGROUND

 "When considering a motion for [injunctive relief], unlike a motion to dismiss," the Court "need not accept as true the well-pleaded allegations in Plaintiff[s'] [C]omplaint." *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020)

1

(citation omitted).  Moreover, the Court may "consider the entire record including affidavits and other hearsay evidence."  *Park Irmat Drug Corp. v. Optumrx, Inc*., 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (citation omitted).  "[N]o factual findings" have been made, "and nothing in this Opinion & Order should be construed as making such findings."  *Wang v. Bank of Am. Corp.*, No. 23 Civ. 4508 (VSB), 2025 WL 2611410, at *1 n.1 (S.D.N.Y. Sept. 10, 2025) (denying motion for a preliminary injunction).

### A.  Factual Background

#### 1.  ACS Facilities and the Policies at Issue

ACS operates two secure detention facilities: Crossroads Juvenile Center in Brownsville, Brooklyn ("Crossroads") and Horizon Juvenile Center in the Mott Haven section of the South Bronx ("Horizon").  ECF No. 10 (Compl.) ¶ 29.  "The [juveniles] who reside at ACS secure detention facilities include [individuals] who have pending criminal charges, as well as [juveniles] who have delinquency cases pending in Family Court."  *Id.* ¶ 31.

As of June 8, 2026, 374 juveniles were detained in these facilities.  ECF No. 42-1 (Ginsburg Decl.) ¶ 12.  Of that population, 18% were 13 to 15 years old, 49% were 16 to 17 years old, and 42% were 18 to 20 years old.  *Id.*  Many juveniles have "had life experiences that include significant trauma, abuse, and/or neglect."  Compl. ¶ 149.  With respect to the charges against the residents, as of June 8, 2026, 75% were being held on homicide-related offenses, including the only 13-year-old who is in residence; 19% were being held on gang indictments with underlying murder-related charges; 11% were being held on gun possession; and 11% were being held on robbery in the first degree.  Ginsburg Decl. ¶ 12.  "The [] population represents over 75 different 'crews,' i.e., gang affiliated units," which have "historic and current conflict with each other."  *Id.* ¶ 31.

2

"Contraband is discovered on a regular basis" at Crossroads and Horizon "through contraband searches and daily searches." *Id.* ¶ 36. ACS maintains a policy governing "Control of and Search for Contraband in Secure and Specialized Secure Detention Facilities," which was reviewed and approved by the New York State Office of Children and Family Services ("OCFS") in October 2018.[1]  *See* ECF No. 42-2 (Ex. A to Ginsburg Decl.). As relevant here, this policy defines "strip searches" as follows:

> [A] visual inspection of the youth's clothing and unclothed body. During a strip search, the following may be inspected: armpits, inside of the mouth (mouth search), ears, nose, navel, hair (and beard), bottoms of feet, and between fingers and toes. This includes a visual inspection of the youth's buttocks area after the youth has been directed to separate the muscles of the buttocks while standing with his/her legs spread and body bent forward at the waist. A strip search may require the youth to lift the breasts and/or scrotum.

*Id.* at 8. The policy further states that a "*routine* strip search[] shall be conducted" (a) "[u]pon admission of an alleged or convicted felony offender," and (b) "[u]pon return and re-entry of the youth to the SD/SSD facility" (referring to "secure detention" and "specialized secure detention," respectively) "when the youth has been out of the custody or supervision of ACS, such as during a court appearance or an off-site medical visit." *Id.* at 9 (emphasis added). A "*[n]on-routine* strip search shall be conducted where there is reasonable suspicion that a youth in the SD/SSD facility is in possession of contraband." *Id.* (emphasis added). Separately, the policy provides that, (a) "[u]pon admission of any youth to the SD/SSD facility who is *accused of committing a misdemeanor (a 'Non-Felony Youth')*," and (b) "[f]ollowing a visit between a

---

[1] The policy attached as Exhibit A to the Ginsburg Declaration, ECF No. 42-2, "governs how ACS performs strip searches and provides for *some* of the circumstances in which those searches are conducted." ECF No. 55 (emphasis added). OCFS subsequently issued an "Enhanced Search Procedures Operations Order" (2023/05), attached as Exhibit B to Ginsburg Decl., ECF No. 42-3, which "clarified the search procedures, including strip search," that would be "performed for '[a]ll youth departing from and returning to SD/SSD facilities.'" ECF No. 55 at 1.

youth and any person other than the youth's lawyer at the SD/SSD facility," "a security (gown) search"—i.e., a visual search "[a]fter the youth has completed taking off his or her clothes and has put on a gown"—shall be conducted. *Id*. at 7 (emphasis added).

More recently, "as new patterns of contraband introduction and concealment within the facility have been discovered, and as [ACS] ha[s] received information and feedback from [its] oversight entities about best practices to foster safety and reduce contraband," ACS has "drafted necessary updates to the 2018 policy." Ginsburg Decl. at ¶ 8. While "ACS has been conducting strip searches of residents in the visit areas since before 2022," ECF No. 55 at 2, Defendant Ginsburg declares that the updated policy "was approved by OCFS earlier this year," Ginsburg Decl. ¶ 8, and allows for strip searches (which are defined to include visual body cavity inspections) in the following scenarios: "[u]pon admission and re-entry to the facility; [f]ollowing contact with members of the public or access to designated visiting areas; and [b]ased upon reasonable suspicion that youth is concealing contraband after receiving authorization from the Associate Commissioner of the facility or designee," *id.* ¶ 9. The written version of that policy "has not yet issued" but "is currently being followed." ECF No. 55 at 2.

In addition to causing "embarrassment and feelings of 'being violated,'" ECF No. 7 (Heinsen Decl.) ¶ 8, these searches can be "psychologically traumatic and harmful, particularly to children," Compl. ¶ 148 (quoting ECF No. 8, Chernow Decl.). Nevertheless, Defendants describe "a pressing institutional need to conduct the strip searches . . . in addition to the other search mechanisms utilized by ACS to ensure the safety and security of ACS residents." Ginsburg Decl. ¶ 29. ACS "routinely find[s] makeshift weapons, [] other weapons including ceramic blades, which cannot be found using a metal detector," and "weapons fashioned out of radiator pieces, metal from video screens, [and] metal from tablets." *Id.* ¶ 30. "A recent trend

4

has been razor blades broken into smaller pieces, which are hard to detect and allow multiple weapons to be distributed." *Id.*

"Despite [ACS's] best efforts, residents engage in repeated efforts to conceal contraband, secreting it in the seams of their clothing, socks, shoes, hair, mouth, genital area and anal cavity." *Id.* ¶ 40. ACS has "seen contraband enter the facilities through a variety of sources including employees, family members, and residents." *Id.* ¶ 35. And while ACS policy "requires youth to be under constant supervision when they are transported to or from court, or between facilities," Compl. ¶ 63, Defendant Ginsburg declares that "[residents] are . . . held in communal pens." Ginsburg Decl. ¶ 32. Moreover, at court, residents "walk throughout hallways where they may interact with other youth in custody," "interact with members of their defense team," and "may have encounters with court staff or social services staff." *Id*. As "these are opportunities for the exchange of contraband," *id.*, youth are searched "prior to departing for court" and "upon return from court," and these searches have "yield[ed] substantial contraband," *id*. ¶ 33. Following virtual visits, ACS has "found residents possessing pieces of metal from the virtual visit room," a "shared visiting area used by all youth," "such as the brackets that hold the monitors in place" and "substantial dangerous contraband . . . , including weapons." *Id*. ¶ 34.

ACS has "engaged in extensive measures to address" this issue, "including obtaining state of the art millimeter wave body scanners[] and strengthening front entry procedures for staff and visitors." *Id*. ¶ 35. ACS has also worked with the Department of Investigations ("DOI") "on investigations of alleged staff misconduct," *id.*, including for "smuggling weapons, drugs, and other contraband into Crossroads," Compl. ¶ 66, "some of which have led to indictments and convictions," Ginsburg Decl. ¶ 35. Defendant Ginsburg declares that "[s]trip searches, including visual body cavity inspections, [however] . . . are the only means to detect

5

certain types of contraband," as "there are no other means to detect non-metallic objects secreted in body cavities, most commonly the rectum." *Id.* ¶ 37. "The only other currently existing means to detect such items are x-ray scanners," but "upon consultation with the NYC Department of Health, ACS is not authorized to use [such scanners] on a juvenile population more than twice annually for each youth." *Id.* ¶ 38.

### 2.    JOHN DOE 1

JOHN DOE 1 "has been in ACS custody six different times since June 2023," *id.* ¶ 14, and is currently detained in Horizon, Compl. ¶ 20. He is "17 years old," *id.* ¶ 72, but will turn 18 by the end of the month, Ginsburg Decl. ¶ 16. JOHN DOE 1 is facing charges of attempted criminal possession of a weapon in the second degree (firearm) and assault in the first degree. *Id.*

JOHN DOE 1's "incident history runs about 175 pages, which is extensive for individuals in [ACS] custody." *Id.* ¶ 18. That history includes the following more recent incidents: On December 2, 2025, JOHN DOE 1 attended a court appearance in Part 73 of New York County Supreme Court. *Id.* ¶ 18. That day, ACS received an email from the Part clerk stating that JOHN DOE 1 had "pulled a blade out on a Correction Officer th[at] morning and [was] now giving them a hard time to be returned to Crossroads."[2] *Id.*; ECF No. 42-4. On February 9, 2026, "JOHN DOE 1 slashed another youth on the right side of his face," and "a sharp metal

---

[2] As the Court acknowledged during the June 15, 2026 hearing, the parties dispute the facts relating to this alleged incident. June 15, 2026 Hr'g Tr. at 26:21. Plaintiffs argue that, "during the June 8th TRO hearing, ACS claimed there was" no incident report documenting the encounter. ECF No. 48 at 12. Defendants explained that "ACS personnel didn't observe" the incident but that it was "reported directly to ACS staff . . . by the part clerk or court staff who did observe it." June 15, 2026 Hr'g Tr. at 32:25–33:2. Defendants attached as an exhibit to the Ginsburg Declaration the email from the Part clerk alerting ACS to the incident. *See* ECF No. 42-4.

object was found inside the radiator of his room." Ginsburg Decl. ¶ 19. On March 24, 2026, ACS staff "observed a blade in a red pen top fall from his waist area, which he picked up and then placed in his mouth." *Id*. And on April 2, 2026, "an illegal lighter was found in his sweater." *Id*.

"When he first entered ACS secure detention, JOHN DOE 1 went through a full strip search" and was not "offered a gown or robe to cover up." Compl. ¶ 73. "At various times when JOHN DOE 1 resided at Crossroads, he was subjected to a strip search," which "did not involve a visual body cavity inspection but required JOHN DOE 1 to take off all his clothes" and "squat and cough." *Id*. ¶¶ 75–76. "On or about April 17, 2026, while residing at Horizon, JOHN DOE 1 was subjected to a strip search and visual body cavity inspection following a virtual visit with his attorney from The Legal Aid Society." *Id*. ¶ 78. That search required JOHN DOE 1 to "bend over, spread his buttocks and expose his anus for inspection by the ACS officer." *Id*. ¶ 79.

"On May 7, 2026, after JOHN DOE 1 finished an in-person visit at Horizon with his Legal Aid Society social worker," he was strip searched with a visual body cavity inspection. *Id*. ¶ 81. JOHN DOE 1 was told that, "if [he] did not comply, [he] would lose phone calls and visits with [his] lawyer." ECF No. 6 (DOE 1 Decl.) ¶ 7. "On May 15, 2026, . . . [b]efore JOHN DOE 1 left for court, [he] was strip searched and forced to spread his buttocks." *Id*. ¶ 11. On or around that date, "JOHN DOE 1 [] tried to commit suicide." Ginsburg Decl. ¶ 21. JOHN DOE 1 declares that he "tried to kill [him]self because of what they're putting [him] through at Horizon and the trauma [he has] endured, including the strip searches, violence, and retaliation for complaining about any of it, left [him] feeling empty and that [he] had nothing to live for." DOE 1 Decl. ¶ 12. Defendant Ginsburg declares that "the suicide attempt did not immediately follow a search." Ginsburg Decl. ¶ 22. "Rather, [she] understand[s] that [JOHN DOE] 1 was

7

meeting with his lawyer, and that there may have been an application to remove his case to Family Court and change the bail conditions, allowing him to return home." *Id.* "[She is] aware that the case remained in Supreme Court, and the bail conditions remained unchanged." *Id.* "At some point, [JOHN DOE 1] left the counsel visit area and entered his cell in the courthouse and tied a sweatshirt around his neck, when multiple correction officers intervened." *Id.* JOHN DOE 1 "was seen in a hospital and returned to the facility." *Id.*

"Following this incident, JOHN DOE 1 [was] [] assigned a 1:1 staff, who monitors him while he is in his hall, to ensure that he does not harm himself." *Id.* ¶ 23. "[T]he aide is not permitted to go into his room or bathroom," though, and "JOHN DOE 1 continues to reside on a hall of 20 juvenile detainees, with whom he shares common facilities." *Id.* Finally, "[o]n May 20, 2026, after JOHN DOE 1 was visited by his lawyers and father, he was subjected to a strip search." Compl. ¶ 94.

### 3. JOHN DOE 2

"JOHN DOE 2 is in custody on a gang indictment: conspiracy in the second degree, [] with the underlying charge of attempted murder []." Ginsburg Decl. ¶ 24. "JOHN DOE 2 is now 18 years old." Compl. ¶ 96. "When JOHN DOE 2 was admitted to Horizon, he underwent a full strip search," where he was also required to "squat and was told to move his genitals 'left,' 'right,' 'up,' 'down,' and 'let it hang.'" *Id.* ¶ 97. "While residing at Horizon, JOHN DOE 2 has been subjected to regular strip searches and, more recently, visual body cavity inspections." *Id.* ¶ 99. "In April 2026, when his mother visited, JOHN DOE 2 was subjected to a strip search that included a visual body cavity inspection after her visit." *Id.* ¶ 104. "After that visit, JOHN DOE 2 told his parents not to come visit him in-person." *Id.* ¶ 107.

8

According to Defendants, on December 30, 2025, "[a] ceramic blade was found in [JOHN DOE] 2's mattress."  Ginsburg Decl. ¶ 27.  Additionally, on May 20, 2026, "a thick piece of metal was found under a radiator in [JOHN DOE] 2's room, as well as a sharp metal object inside his cubby."  *Id.* ¶ 26.  On or around May 28, 2026, JOHN DOE 2 "was strip searched prior to a court appearance," and "[a] supervisor noticed an object protruding from his buttocks, which turned out to be a ceramic blade."  *Id.* ¶ 25; *see also* ECF No. 46 (contesting whether the blade was seen during a "visual body cavity inspection," as opposed to "a routine inspection").

### B. Procedural Background

On June 5, 2026, Plaintiffs initiated this action pursuant to 42 U.S.C. § 1983 alleging that ACS policy mandates strip searches and visual body cavity inspections in violation of the First, Fourth, Sixth, and Fourteenth Amendments to the U.S. Constitution.  ECF No. 1.  Plaintiffs also filed an emergency motion for a preliminary injunction and temporary restraining order, ECF No. 3, accompanied by a memorandum of law, ECF No. 4 (Mot.),[3] seeking to enjoin Defendants from:

> [C]onducting a strip search or visual body cavity inspection of any resident of an ACS secure detention facility, except upon individualized suspicion that the resident is in possession of contraband, (a) when the resident is transferred to or from a court appearance; (b) before or after the resident has a virtual visit; (c) before or after the resident meets with their counsel, social worker, or other members of their counsel's legal team; and (d) before or after the resident meets with a parent or guardian.

ECF No. 3.  That same day, the Honorable Dale E. Ho, sitting in Part 1, scheduled a hearing for June 15, 2026.  ECF No. 14.  Judge Ho directed Defendants to file any opposition to the motion by June 9, 2026, and Plaintiffs to file any reply by June 11, 2026.  *Id.*

---

[3] Citations to the parties' briefs refer to the internal pages of the documents.

**1.  Emergency Motion for a Limited Temporary Restraining Order (ECF No. 15)**

On June 7, 2026, Plaintiffs filed an emergency motion for a limited temporary restraining order, ECF No. 15, seeking to enjoin Defendants "from conducting a visual body cavity inspection of [JOHN DOE] 1 or [JOHN DOE] 2 [prior to the June 15 hearing] when they [were] transferred to or returned from [the New York Supreme Court] unless individualized, reasonable suspicion exist[ed] to support such an invasive search." *See* ECF Nos. 15–17 (explaining that Plaintiffs were scheduled to appear in Supreme Court on June 9 and 12, 2026).  Judge Ho set a hearing on this motion for June 8, 2026 at 3:00 p.m.  ECF No. 18.  On June 8, 2026, Defendants requested that the hearing be canceled and that Defendants' time to respond to Plaintiffs' motion for a temporary restraining order, ECF No. 3, be extended until June 23, 2026.  ECF No. 23 (citing the significance of the issues and the need for "extensive coordination and collaboration between [the City Law Department] and ACS").

The hearing on the limited motion for a temporary restraining order went forward on June 8, 2026.  *See* ECF No. 28.[4]  Because the parties "raised material facts that had not yet been put into the record" regarding the JOHN DOES' individual incident histories, Judge Ho directed the parties to file, by June 8, 2026 at 6:30 p.m., "any additional information . . . that they would like the Court to take under consideration prior to ruling on the emergency motion for TRO with respect to [JOHN DOE 1]'s June 9, 2026 court appearance"—and, by June 9, 2026 at 5:00 p.m., "any additional information . . . that they would like the Court to take under consideration prior to ruling on the emergency motion for TRO with respect to each [DOE]'s respective June 12, 2026 court appearances." *Id.*

---

[4] Defendants' application to adjourn the conference, ECF No. 23, was denied as moot.  June 8, 2026 Hr'g Tr. at 3:12–14; ECF No. 32.

Following the hearing, Plaintiffs filed a letter and two ACS Incident Reports, ECF Nos. 26–27, regarding Defendants' allegation that JOHN DOE 1 had "brandished" a knife at a court officer in December 2025, June 8, 2026 Hr'g Tr. 18:5–7. Defendants also filed a letter regarding Plaintiffs' upcoming court hearings, stating that JOHN DOE 1 did not have a hearing scheduled for June 9, but rather for June 12 and June 16, and requesting additional time to file information regarding JOHN DOE 1's incident history before Judge Ho ruled on the motion for a limited temporary restraining order. ECF No. 29.

Later on June 8, 2026, Judge Ho granted a limited temporary restraining order enjoining Defendants from "conducting a visual body cavity inspection of [JOHN DOE] 1 when transferred to or returned from court on June 9, 2026, except upon individualized suspicion that the resident [wa]s in possession of contraband." ECF No. 30.

On June 9, 2026, Plaintiffs requested an extension of time until June 10, 2026 to respond to any information filed by Defendants that would be "relevant for the emergency motion for TRO with respect to [the] June 12, 2026 court appearance," noting that Defendants "ha[d] not yet provided additional information" regarding JOHN DOE 1's and JOHN DOE 2's histories of possessing and concealing contraband. ECF No. 37. Defendants subsequently filed a letter attaching several incident reports detailing the JOHN DOES' histories of possessing and concealing contraband. ECF No. 38. Judge Ho granted Plaintiffs' request for an extension. ECF No. 40.

On June 10, 2026, Plaintiffs filed an additional letter asking the Court to "order the City to produce relevant documents" because (1) "the name of the juvenile who was the subject of the report contained in Exhibit A [to Defendants' June 9, 2026 letter, ECF No. 38,] was redacted"; (2) "that exhibit, and Exhibits B, C, D, E, and F were excerpts from longer documents"; and

11

(3) Defendants had failed to "provide the ACS 'Secure Detention Strip Search Form'" for two incidents that involved JOHN DOE 1 or JOHN DOE 2, notwithstanding that "ACS's written policy requires a Secure Detention Strip Search Form anytime a strip search is conducted."  ECF No. 43.  Defendants opposed the requests on the grounds that "Exhibit A [subsequently was] provided to counsel unredacted" and that Plaintiffs had "not established good cause to open discovery at this juncture."  ECF No. 44.  Judge Ho directed Defendants to "disclose any additional information from these documents that relate to the incidents discussed in Defendants' opposition to Plaintiffs' application for limited TRO, ECF No. 38," and granted Plaintiffs' request for "Secure Detention Strip Search Forms" relating to two incidents involving JOHN DOE 1 or JOHN DOE 2.  ECF No. 45.  Judge Ho also granted Plaintiffs an extension until June 11, 2026 to file additional briefing related to the emergency motion for a limited temporary restraining order.  *Id.*  On June 11, 2026, Plaintiffs filed a letter in support of that emergency motion.  ECF No. 46.

On June 11, 2026, Judge Ho denied Plaintiffs' emergency motion for a limited temporary restraining order, ECF No. 15, in connection with the JOHN DOES' June 12, 2026 court appearances.  ECF No. 47.

### 2.  Motion for a Temporary Restraining Order (ECF No. 3)

In light of Defendants' request (at ECF No. 23) for an extension of time until June 23, 2026 to respond to Plaintiffs' motion for a temporary restraining order, ECF No. 3, Judge Ho ordered that the parties could "meet and confer, and propose—by June 9, 2026—an alternative briefing schedule for the June 15, 2026 hearing."  ECF No. 32.  The parties proposed that Defendants file their opposition by June 10, 2026 and that Plaintiffs file their reply by June 12, 2026.  ECF No. 33.  Judge Ho adopted that revised schedule and, based on Defendants'

statement that JOHN DOE 1 had a court appearance scheduled for June 16, 2026, *see* ECF No. 29, directed that the parties' briefing address any issues relating to the June 16, 2026 hearing and inform the Court of any additional upcoming appearances in New York Supreme Court.  ECF No. 39.  Defendants filed their opposition on June 10, 2026, ECF No. 42 (Opp.), including a Declaration of Defendant Nancy Ginsburg, Deputy Commissioner for the Division of Youth and Family Justice (Ginsburg Decl.), and exhibits consisting of the operative ACS search policy and additional incident reports relating to both JOHN DOE 1 and JOHN DOE 2, ECF Nos. 42-2–42-6.  Plaintiffs filed their reply on June 12, 2026.  ECF No. 48 (Reply).

On June 15, 2026, Plaintiffs filed a revised request for a temporary restraining order that seeks to enjoin Defendants from performing searches in the following situations, unless "the search [wa]s supported by reasonable suspicion that the resident ha[d] contraband concealed on their body":  "(1) strip searches and visual body cavity inspections after counsel visits; (2) strip searches and visual body cavity inspections after virtual visits; (3) visual body cavity inspections after family visits; and (4) visual body cavity inspections upon returning from court."  ECF No. 52.

Also on June 15, 2026, this Court heard argument on Plaintiffs' motion for a temporary restraining order, ECF Nos. 3, 52.  During the hearing, Plaintiffs moved for an additional limited temporary restraining order enjoining any visual body cavity inspection following JOHN DOE 1's June 16, 2026 appearance in New York Supreme Court absent "reasonable suspicion."  June 15, 2026 Hr'g Tr. at 3:1–11, 4:11–13.

Because "several different versions of policies and guidelines" had been submitted, the Court directed the parties to confer about the operative strip search and visual body cavity inspection policies, including "when [] those policies [went] into effect," and to file, "a joint

letter attaching the policy or policies that [the parties] say are operative and controlling here." *Id.* at 6:12–13, 9:9–15. Further, because Plaintiffs stated that they "ha[d not] met and conferred with the [C]ity about [their] narrowed request for relief," as required by the Court's Individual Rule 4(b), the Court directed the parties to "meet and confer for a minimum of one hour . . . either in person, on the phone, or via a virtual meeting about [the] proposed narrowed relief" and to file a joint letter "let[ting the Court] know if there's anything to know about the upshot of that discussion." June 15, 2026 Hr'g Tr. at 5:20–21, 6:2–5, 42:25–43:4.

After the hearing, Defendants filed a letter addressing the "scope of and basis for current ACS strip search policy and procedure." ECF No. 55. The letter states that the current policy requires strip searches with visual cavity inspections "[u]pon admission and re-entry to the facility; [f]ollowing contact with members of the public or access to designated visiting areas; and [b]ased upon reasonable suspicion that youth is concealing contraband after receiving authorization from the Associate Commissioner of the facility or designee." *Id*. Plaintiffs filed a response, explaining that they "could not join" Defendants' letter because "it contained new information about the purported policies that [was] not described to [them] on [their] earlier conferral." ECF No. 56. Plaintiffs "immediately requested an additional meet and confer, but defense counsel indicated they would not be able to confer." *Id.*

On June 15, 2026, the Court denied Plaintiffs' application for a limited temporary restraining order enjoining Defendants from conducting a visual body cavity inspection of JOHN DOE 1 following his appearance in New York Supreme Court on June 16, 2026 absent reasonable suspicion that contraband was secreted in a body cavity. ECF No. 57.

On June 18, 2026, Defendants filed a letter stating that "conversations regarding the issues raised in [P]laintiffs' application [we]re ongoing at the highest levels," and that

14

Defendants "[had] not had sufficient time to engage in a comprehensive review of the policies with the necessary stakeholders, and [were] not in a position to propose or adopt any revisions to current policy at [that] time." ECF No. 60. Plaintiffs filed a response, arguing that, because "ACS does not have an authorized policy that permits it to perform strip searches and visual body cavity inspections following in-person and virtual visits," "the Court should apply the less rigorous, fair-ground-for-litigation standard in assessing the visit searches in conjunction with Plaintiffs' TRO application." ECF No. 61. Plaintiffs further contended that, because the requested "TRO is prohibitory in nature," Plaintiffs "need not meet the heightened standard for mandatory injunctions." *Id.*

## LEGAL STANDARD

"A temporary restraining order, like a preliminary injunction, is an extraordinary remedy that will not be granted lightly." *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997). "Ordinarily, when a preliminary injunction will affect a government defendant, 'the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'" *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 683 (S.D.N.Y. 2025) (quoting *Kane v. de Blasio*, 19 F.4th 152, 163 (2d Cir. 2021)); *see also Kane,* 19 F.4th at 163 ("When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge." (citation omitted)); *Geller v. de Blasio*, 613 F. Supp. 3d 742, 746 (S.D.N.Y. 2020) (noting that the standard for adjudicating a temporary restraining order and a

15

motion for a preliminary injunction is the same).  Here, each party urges that an alternate standard applies.

Plaintiffs contend that "the Court should assess Plaintiffs' TRO application under [a] *less rigorous* fair-ground-for-litigation standard because ACS is not acting pursuant to an authorized policy," and because the "TRO [sought] is prohibitory and need not meet the heightened burden for a mandatory injunction."  ECF No. 61 at 1 (emphasis added).  For their part, Defendants assert that a *higher standard*—"*clear or substantial* likelihood of success on the merits"—should control because Plaintiffs are challenging the "status quo."  Opp. at 6 (emphasis added); June 15, 2026 Hr'g Tr. at 25:6.  For the reasons explained below, neither is correct.

The fair-ground-for-litigation standard only requires a movant to demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of the hardships tips decidedly in favor of the moving party."  *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000) (citation omitted).  "But when, as here, the moving party seeks a preliminary injunction that will affect 'government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'"  *Id.* (quoting *Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999)).  Defendants have explained that the relevant ACS search procedures were promulgated "[p]ursuant to New York State Law" and "approved by [OCFS] and State Commission of Correction ('SCOC')."  Opp. at 2; 9 NYCRR § 180-3.18.  In addition, Defendant Ginsburg declares that the operative ACS search policy was "reviewed and approved by [OCFS]."  Ginsburg Decl. ¶¶ 8–9; *see also* ECF No. 55 at 2.

As for the heightened standard of "clear or substantial likelihood of success on the merits," the Second Circuit has upheld application of that test in the context of evaluating

mandatory injunctions, which "alter the status quo *by commanding some positive act* . . . [and] thus alter[] the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 88–89 (2d Cir. 2006) (quoting *Tom Doherty Assocs. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)). But when parties seek an injunction that would "prohibit[], rather than compel[], government action," courts in this Circuit apply the "likelihood of success on the merits" test.[5] *Id*. at 89–90. Here, Plaintiffs request a prohibitory injunction that would "enjoin Defendants . . . from performing the

---

[5] The Second Circuit's articulation of this test has not been uniform. "Certain Second Circuit opinions simply note that where a preliminary injunction would affect a government action purportedly taken in the public interest pursuant to a statutory or regulatory regime, 'plaintiffs must establish a clear or substantial likelihood of success on the merits.'" *State of New York v. Locke*, No. 08 Civ. 2503 (CPS) (RLM), 2009 WL 1194085, at *10 (E.D.N.Y. Apr. 30, 2009) (quoting *County of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (quoting *Sussman v. Crawford,* 488 F.3d 136, 140 (2d Cir. 2007) (quoting *Tunick v. Safir,* 209 F.3d 67, 70 (2d Cir. 2000) (citing *Tom Doherty*, 60 F.3d at 34)))). "In *Tom Doherty,* however, upon which the opinions cited above rely, the Second Circuit reasoned that a heightened 'substantial likelihood' standard should apply in cases where a movant's request for an injunction would 'alter, rather than maintain, the status quo, or . . . provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Id.* (quoting *Tom Doherty,* 60 F.3d at 33–34). "Other Second Circuit precedent makes clear that the 'substantial likelihood' standard applies only if the *Tom Doherty* criteria are satisfied." *Id.* (citing *Wright,* 230 F.3d at 547 (in an action challenging a government action taken in the public interest pursuant to a statutory or regulatory scheme, "when the injunction sought will alter rather than maintain the status quo the movant must show clear or substantial likelihood of success" (internal citations and quotation marks omitted)); *Rodriguez v. DeBuono,* 175 F.3d 227, 233 (2d Cir. 1999) (same); *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir. 1996) (same)). As the language used in *Nassau*, *Sussman*, and *Tunick* appears to be an inconsistency rather than an overruling, the Court follows the test laid out in *Tom Doherty* and its more harmonious progeny. *See, e.g.*, *Mastrovincenzo*, 435 F.3d at 89.

17

[challenged] searches." ECF No. 52 at 1. Accordingly, the Court applies the "likelihood of success on the merits" test to this motion for a temporary restraining order.[6]

## DISCUSSION

Plaintiffs claim that Defendants' policies regarding strip searches and visual body cavity inspections are "plainly unconstitutional" because the searches are "*more invasive* than the searches held unconstitutional in" *N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004). Mot. at 1–2. As previously explained, Plaintiffs challenge the following searches "absent reasonable suspicion": (1) strip searches and visual body cavity inspections after counsel visits; (2) strip searches and visual body cavity inspections after virtual visits; (3) visual body cavity inspections after family visits; and (4) visual body cavity inspections upon returning from court. ECF No. 52. Defendants maintain that the search policies are justified in that they are "intended to, and do[], serve *inter alia* the functions of detecting dangerous contraband, deterring the trafficking of contraband, and protecting the safety of youth residents, staff and visitors"—and, further, that they were "designed to target only instances in which there is, at least, a generalized concern that residents may come into contact with other individuals or contraband." Opp. at 11–12. On the record before the Court, a likelihood of success on the merits with respect to the challenged searches and inspections has not been shown.

### A. The Law Governing Strip Searches

"[P]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (internal quotation marks and citation omitted). But the Supreme Court has cautioned that "[t]he difficulties of operating a

---

[6] Because the Court determines that Plaintiffs have not shown a likelihood of success on the merits, Plaintiffs would fail to satisfy the higher "clear or substantial" standard in any event.

detention center must not be underestimated by the courts" and has "confirmed the importance of deference to correctional officials." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012). "A regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'"[7] *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). "The burden is upon the prisoner to show that a challenged prison regulation is unreasonable." *Covino*, 967 F.2d at 79 (affirming denial of preliminary injunction in strip search case); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.").

While "[a] strip search with body-cavity inspection is the practice that 'instinctively' has given the Supreme Court 'the most pause,'" *N.G.*, 382 F.3d at 233 (quoting *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)), "[g]enerally strip searches have been upheld as a reasonable security measure within a correctional facility even in the absence of probable cause as long as they are related to a legitimate penological goal," *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) (dismissing Fourth Amendment challenge to strip search where search "was conducted inside [Defendant's] cell as part of a larger security response to a stabbing at the prison"), *aff'd*, 461 F. App'x 18 (2d Cir. 2012). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application"; "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Wolfish*, 441 U.S. at 559 (deeming a detention facility "a unique place fraught with serious security dangers," in which "inmate[s] attempt[] to secrete [money, drugs, weapons, and other contraband] by concealing them in body cavities").

---

[7] Plaintiffs challenge "ACS's unconstitutional search procedures" as a whole. Compl. ¶ 150.

Plaintiffs rely on *N.G.* in arguing that strip searches of juveniles categorically are subject to a different test—namely, that the policy must "seek 'a minimum of intrusiveness coupled with maximal effectiveness so that the searches bear a close and substantial relationship to the government's *special needs*.'" Reply at 1 (emphasis added) (quoting *United States v. Lifshitz*, 369 F.3d 173, 186 (2d Cir. 2004)). *N.G.* pre-dates the Supreme Court's decision in *Florence*, however, and is distinguishable in any event.

In *N.G.*, the Second Circuit evaluated strip searches of two juveniles who were detained pursuant to a "families with service needs" designation. 382 F.3d at 227. That designation referred to the following:

> a family that includes a child who has acted in one of five ways: (1) run away
> from home without just cause, (2) become beyond the control of parents,
> (3) engaged in indecent or immoral conduct, (4) been a truant or overtly defied
> school rules, or (5) if thirteen years of age or older, has engaged in sexual
> intercourse with a person of similar age.

*Id.* The first plaintiff was designated due to "her repeated failures to obey court orders requiring her to stay at home or at institutions in which she was placed" and challenged eight specific strip searches. *Id.* at 228–29. The second plaintiff was designated on account of her "truancy" and challenged two specific strip searches. *Id.* at 229. "[N]o contraband was found" in any of the challenged searches. *Id.*

The *N.G.* Court adopted a "special needs" standard to conduct "a fact-specific balancing of the intrusion . . . against the promotion of legitimate governmental interests" and reviewed whether the government had "reasonable suspicion" for each search at issue. *Id.* at 231–34; *see id.* at 238 (concurring opinion).[8] It declined to analyze the plaintiffs' challenge under *Turner v.*

---

[8] Separately, the Second Circuit affirmed the district court's "denial of class action certification," as it "was well within the District Court's discretion." *N.G.*, 382 F.3d at 238.

*Safley*, 482 U.S. 78, 89 (1987), which held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." The Second Circuit reasoned that, to apply *Turner* to searches in a detention facility where juveniles were "confined for running away from home or failing to attend school, even where such conduct occurs in violation of a court order," "would extend that standard beyond the context in which it was established—a prison." *N.G.*, 382 F.3d at 234–35. Importantly, unlike in the instant matter, the plaintiffs in *N.G.* "were not confined awaiting trial on any criminal charges" (nor had they "been convicted of any crime"). *Id.* Indeed, the court mused that "[p]erhaps the *Turner* standard applies to a state facility confining juveniles who have been convicted of conduct that would be a crime if committed by an adult, and, perhaps it even applies to juveniles awaiting trial for such conduct." *Id.* at 235. In such circumstances, there may be "a substantial argument that a strip search of juveniles . . . would satisfy the *Turner* standard of being reasonably related to valid penological interests." *Id.*

The detention centers and Plaintiffs before this Court are more analogous to those that *N.G.* suggested may be subject to the *Turner* standard.[9] As previously stated, *supra* at 2, 75% of

---

[9] Plaintiffs' other cases considered different searches—i.e., searches incident to arrest or of prison visitors—or are otherwise distinguishable. *See Soley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019) (discussing "a visual body cavity search conducted as an incident to a lawful arrest"); *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (evaluating search incident to arrest), *abrogated by Murphy v. Hughson*, 82 F.4th 177, 184 (2d Cir. 2023); *Murphy*, 82 F.4th at 185 (distinguishing *Florence* because *Murphy* related to "actions taken by an individual officer acting on his own whim and contrary to established jail policy," not to a "prison-wide policy on its face or as applied to him"); *Bobbit v. Marzan*, No. 16 Civ. 2042 (AT), 2020 WL 5633000, at *11 (S.D.N.Y. Sept. 21, 2020) (evaluating search incident to arrest); *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (evaluating searches of prison visitors). "The legitimate ends of a detainee safety search are [] broader than a search incident to a lawful arrest," and the Supreme Court in *Florence* specifically emphasized the ability of "corrections officials to establish reasonable policies for routine suspicionless searches to handle the 'laborious administration of prisons.'" *Fate v. Charles*, 24 F. Supp. 3d 337, 348 (S.D.N.Y. 2014). For "strip searches as required by a

the juveniles at Horizon and Crossroads are "being held on homicide-related offenses," "19% are being held on gang indictments with underlying murder-related cha[r]ges," "11% are being held on Criminal Possession of a Weapon in the [second] [d]egree," and "11% are being held on Robbery in the [first] degree." Ginsburg Decl. ¶ 12. Further, in contrast to the facility in *N.G.*, "[c]ontraband is discovered on a regular basis through contraband searches" at Crossroads and Horizon. Ginsburg Decl. ¶ 36; *see N.G.*, 382 F.3d at 242–43 (concurring opinion) (noting that, in *N.G.*, there were only "thirty-four 'event reports' for the years 1995 through 2000 produced during discovery").

In *Florence*, eight years after the Second Circuit decided *N.G.*, the Supreme Court upheld visual body cavity inspections for "persons arrested for a minor offense" "as a routine part of the intake process." 566 U.S. at 324. The Court explained that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id.* at 328. It also "repeated [prior] admonition[s] that, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations[,] courts should ordinarily defer to their expert judgment in such matters." *Id.* (internal quotations and citation omitted). The Court relied on its prior reasoning in *Turner* in holding that a policy "impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'" *Id.* at 326. In applying the "*Turner* standard (and holdings in subsequent cases)," *Florence* "raise[d] the burden on pretrial detainees challenging a suspicionless search policy." *Fate*, 24 F. Supp. 3d at 348.

---

reasonable policy for maintaining order in the general population of a jail," "'special needs' may be a misnomer." *Id.* at 346–47.

*Florence* is not "limited in application to adult detainees." *J.B. ex rel. Benjamin v. Fassnacht*, 801 F.3d 336, 343 (3d Cir. 2015). Indeed, the "security dangers to the institution are the same whether the detainee is a juvenile or an adult." *Id.* "[A]ny individualized, reasonable suspicion inquiry falters in juvenile detention centers for the same reasons it does so in adult facilities," in that "it would be a difficult if not impossible task," for example, "to identify inmates who have propensities for violence," making the inquiry both "impractical" and "unrealistic." *Id.* at 344–45 (emphasis added); *see also Mabry v. Lee Cnty.*, 168 F. Supp. 3d 940, 947 (N.D. Miss. 2016) (analyzing *N.G.* in light of *Florence* and finding that "[n]othing suggests that this contextualized inquiry should operate differently when the detainee is a juvenile"), *aff'd*, 849 F.3d 232, 238 (5th Cir. 2017) ("[I]n the correctional context—whether juvenile or adult—courts, which are not experts, should still defer to officials who are.")

Accordingly, in evaluating Plaintiffs' constitutional claims, including Plaintiffs' Sixth and First Amendment claims, the Court considers whether the challenged searches were "reasonably related to legitimate penological interests." *Florence*, 566 U.S. at 326; *see also United States v. Kassir*, No. 04 Cr. 356 (JFK), 2008 WL 2695307, at *3 (S.D.N.Y. July 8, 2008) (applying *Turner* standard to Sixth Amendment claim and evaluating whether policy was "'reasonably related' to the [Metropolitan Correctional Center's] legitimate objective of protecting institutional security"); *Schick v. Apker*, No. 07 Civ. 5775 (SHS), 2009 WL 2016926, at *2 (S.D.N.Y. July 10, 2009) (applying *Turner* standard to Sixth Amendment challenge); *Overton*, 539 U.S. at 131–32, (2003) (applying *Turner* standard to First Amendment "right to intimate association" claim).

### B. Analysis

There is no dispute that "inmates retain a limited right to bodily privacy under the Fourth Amendment" and that "visual body cavity search[es], such as the one[s] conducted here, [are] invasive." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). "[T]he adverse psychological effect of a strip search is likely to be more severe upon a child than an adult." *N.G.*, 382 F.3d at 232. "Where the state is exercising some legitimate custodial authority over children," however, "its responsibility to act in the place of parents (*in loco parentis*) obliges it to take special care to protect those in its charge, and that protection must be concerned with dangers from others and self-inflicted harm." *Id.* Here, Plaintiffs contest both "the scope of the particular intrusion[s]" and the "justification[s] for initiating [them]." *Wolfish*, 441 U.S. at 559.

#### 1. The Scope of the Intrusion

Plaintiffs challenge "ACS's blanket policy of performing [] visual body cavity inspection[s]" absent "individualized suspicion" every time a detainee "sees his attorney or social worker or mother"; "goes to and comes back from court"; or attends a "virtual visit." Mot. at 19–20 (emphasis omitted); *see* June 15, 2026 Hr'g Tr. at 16:21–25, 27:7–15. Plaintiffs also claim that Defendants "fail[] to recognize that [strip searches and visual body cavity inspections] are distinct types of searches," and that visual body cavity inspections are "significantly more intrusive than a strip search." Reply at 10 (citing *Sloley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019)).

Defendant Ginsburg declares that "[t]here is a pressing institutional need to conduct the strip searches currently permitted by ACS policy, in addition to the other search mechanisms utilized by ACS to ensure the safety and security of ACS residents and staff." Ginsburg Decl. ¶ 29. ACS has discovered "new patterns of contraband introduction and concealment within the

24

facility," *id.* ¶ 8, including "the introduction of ceramic blades as [the] recovery rates of metal/steel blades [through other means] were more successful," *id.* ¶ 40. *See* Opp. at 11 (the search policy "is intended to, and does, serve *inter alia* the functions of detecting dangerous contraband, deterring the trafficking of contraband, and protecting the safety of youth residents, staff and visitors"). Defendants "routinely find makeshift weapons, and other weapons including ceramic blades, which cannot be found using a metal detector." Ginsburg Decl. ¶ 30. Further, "residents engage in repeated efforts to conceal contraband, secreting it in the seams of their clothing, socks, shoes, hair, mouth, genital area and anal cavity." *Id.* ¶ 40.

Defendants represent that "[s]trip searches, including visual cavity inspections . . . are the only means to detect certain types of contraband"; there are "no other means to detect non-metallic objects secreted in body cavities, most commonly the rectum." *Id.* ¶ 37. "The only other currently existing means to detect such items are x-ray scanners," but "ACS is not authorized [by the NYC Department of Health] to use [those scanners] on a juvenile population more than twice annually for each youth." *Id.* ¶ 38.

As recently as May 28, 2026, during a strip search of JOHN DOE 2, "[a] supervisor noticed an object protruding from his buttocks, which turned out to be a ceramic blade." *Id.* ¶ 25; ECF No. 38-1.[10] On or around March 24, 2026, staff observed JOHN DOE 1 place a "blade," which fell from a pen top, "in his mouth." Ginsburg Decl. ¶ 19.

---

[10] Plaintiffs contend that this "object may have been seen during a routine strip search and *not* during a visual body cavity inspection" and that Defendants therefore "ha[ve] not substantiated [their] claim that 'a strip search without a visual cavity inspection of either the anus or the inside of a person's mouth is effectively meaningless.'" ECF No. 46 at 1. Either way, this incident supports Defendants' concerns regarding the concealment of contraband at ACS secure detention facilities, and Plaintiffs have not offered "substantial evidence showing [that Defendants'] policies are an unnecessary or unjustified response to problems of jail security." *Florence*, 566 S. Ct. 322–23.

In response, Plaintiffs highlight the New York City Department of Corrections search policy for adult inmates at Rikers Island and the New York State Department of Corrections & Community Supervision search directive, which they allege "provide meaningfully different standards for strip searches" for adults and, unlike the ACS policy, differentiate "strip searches *without* a visual body cavity inspection and strip search[es] *with* a visual body cavity inspection." Reply at 10; ECF No. 49 ¶ 6. But the record before the Court does not reveal the penological justifications for Rikers's search policy or the State's search directive, whereas Defendants have provided specific penological justifications for the strip searches and visual body cavity inspections performed at Crossroads and Horizon.

On the record summarized above, Plaintiffs have failed to demonstrate that the challenged searches and/or inspections are not "reasonably related to [a] legitimate penological interest[]." *Florence*, 566 U.S. at 328 (quoting *Turner*, 482 U.S. at 89). They have not shown "that the officials have exaggerated their response to these considerations," *id.*, nor proffered "any facts suggesting that the [visual body cavity] search[es] [are] performed to intentionally humiliate or abuse" the detainees, *Goldson v. Department of Corrections*, No. 23 Civ. 9889 (LTS), 2024 WL 54401, at *4 (S.D.N.Y. Jan. 2, 2024) (holding that the plaintiff failed to "allege sufficient facts to state viable claim for an unconstitutional strip search"). Accordingly, "deference must be given to the officials in charge." *Florence*, 566 U.S. at 330; *Wolfish*, 441 U.S. at 547 ("Prison administrators [] should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

26

### 2.  Searches in Connection with Court Appearances

Plaintiffs argue that there is "no justification" for routine strip searches and visual body cavity inspections following court appearances because "the [C]ity has . . . full custody and ability to surveil" ACS detainees "at all given times when it takes [them] to court and brings [them] back."  June 15, 2026 Hr'g Tr. at 28:10–15, 28:21–22, 29:13–17; Mot. at 6.

Defendants counter that detainees "transported to court" are "held in communal pens," "walk throughout hallways where they may interact with other youth in custody and where different groups of youth may be held each day," "interact with members of their defense team," and "may have encounters with court staff or social services staff."  Ginsburg Decl. ¶ 32.  That "potential for contact with other youth in custody, non-ACS staff, and the public in conjunction with court appearances" creates "opportunities for the exchange of contraband," and the searches following court appearances "yield substantial contraband, which if not discovered, would be introduced to the facility."  *Id*. ¶¶ 32–33.  Just last month, JOHN DOE 2 was "strip searched prior to a court appearance," and supervisors found a "ceramic blade" "protruding from his buttocks."  *Id.* ¶ 25; ECF No. 38-1.[11]  According to Defendants, "[w]ithout the ability to search youths upon returning from court," they would "lack a critical tool to prevent contraband from entering the facility and the residential halls, increasing the risk of harm to youth [and] staff."  Ginsburg Decl. ¶ 40.  *Compare id.* ¶¶ 32–33, 40, *with N.G.*, 382 F.3d at 229, 233–34 ("no state interest to warrant repeated strip searches simply because of transfers to other facilities

---

[11] As previously noted, *supra* at 6, Defendants have also submitted evidence that, on December 2, 2025, JOHN DOE 1 "pulled a blade out on a Correction Officer" while at New York Supreme Court.  Ginsburg Decl. ¶ 18; ECF No. 42-4 (email from New York Supreme Court Clerk).  Plaintiffs have provided ACS Incident Reports stating, however, that "[JOHN DOE 1] never presented any weapon, nor did he waive any weapon towards DOC officers."  ECF Nos. 26–27.  In light of this dispute, the Court does not consider this incident in evaluating Plaintiffs' likelihood of success on the merits with respect to searches following court appearances.

[including court]" where detainees had been "transported . . . *in handcuffs and shackles*," but "recogniz[ing] that unavoidable circumstances might arise, *even during a period of continuous custody*, that create opportunities for an inmate to acquire contraband, in which event a strip search might well be reasonable" (emphasis added)), *and Vasquez v. Williams*, No. 13 Civ. 9127 (LGS), 2015 WL 4757657, at *4 (S.D.N.Y. Aug. 11, 2015) ("strip search policy" was "not reasonably related to legitimate penological interests" where inmates were "restrained in a manner that prevented any kind of holding or grabbing," such that "there was *no possibility* of [them] gaining access to any contraband," and "[d]efendants were aware of the initial search of, the constant supervision of, and the physical restraints on, inmates who were transported").

Accordingly, Plaintiffs have not demonstrated a likelihood of success on the merits of their constitutional claims regarding the search policy as it applies to court appearances.

### 3.  Searches in Connection with Contact Visits

Plaintiffs argue that there is "no state interest sufficient to warrant repeated strip searches" following counsel and family visits.  Reply at 7.  Specifically, Plaintiffs aver that Defendants have "never claim[ed] that contraband has been exchanged during counsel visits with criminal defense counsel as well as other members of the legal defense team," *id*. (citing *N.G.*, 382 F.3d at 226; *Mashburn v. Yamhill Cnty.*, 698 F. Supp. 2d 1233, 1240 (D. Or. 2010)), or offered "actual evidence of having found contraband passed during a family visit," *id.* at 8. Instead, Plaintiffs assert that ACS employees are responsible for smuggling contraband into the facilities.  Compl. ¶¶ 65–71; Reply at 5.

It is well established, however, "that strip searches of all detainees at intake or after contact visits, *with or without reasonable suspicion*, are reasonably related to legitimate security concerns."  *Perkins v. City of New York*, No. 14 Civ. 3779 (WHP), 2017 WL 1025987, at *2

(S.D.N.Y. Mar. 15, 2017) (emphasis added) (granting motion to dismiss with respect to strip search claims because "[t]he Complaint contain[ed] no allegations to allow an inference that the strip searches were constitutionally defective" or "not rationally related to a penological interest"). "Contact visits invite a host of security problems" because "[t]hey open the institution to the introduction of drugs, weapons, and other contraband," and "[v]isitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers." *Block v. Rutherford*, 468 U.S. 576, 586 (1984).

Defendants "have seen contraband enter the facilities through a variety of sources," including through "family members." Ginsburg Decl. ¶ 35. Defendants have also explained that "the policies are designed to target only instances in which there is, at least, a generalized concern that residents may come into contact with other individuals or contraband." Opp. at 12. While Defendants might not have made *specific* "claims that contraband has been exchanged during counsel visits" or provided "evidence of having found contraband passed during a family visit," Reply at 7–8, that does not demonstrate that Defendants "'exaggerated their response' to the need to limit the presence of contraband in [ACS] facilities," *Israel v. City of New York*, No. 11 Civ. 7726 (JMF), 2012 WL 4762082, at *4 (S.D.N.Y. Oct. 5, 2012). Plaintiffs' allegation that ACS employees have smuggled contraband into the facilities, Compl. ¶¶ 65–71; Reply at 5, likewise fails to demonstrate that Defendants have "exaggerated their response" to legitimate penological concerns surrounding contact visits—especially considering that ACS has "engaged in extensive measures to address this concern," including "work[ing] with DOI on investigations of alleged staff misconduct, some of which have led to indictments and convictions," Ginsburg Decl. ¶ 35. Plaintiffs have thus failed to show a likelihood of success on the merits of their constitutional claims regarding the search policy relating to contact visits.

### 4. Searches in Connection with Virtual Visits

Plaintiffs allege that ACS is conducting strip searches "at times" with respect to "virtual visits."[12] Compl. ¶ 179. Defendants, on the other hand, have explained that "all visits, including virtual visits, are conducted in a *shared visiting area* used by all youth." Ginsburg Decl. ¶ 34 (emphasis added). ACS has "found residents possessing pieces of metal from the virtual visit room, such as the brackets that hold the monitors in place." *Id*. "Even under careful observation, youth bring, receive, and acquire metal and other dangerous items during the course of their virtual visits," and "[s]ubstantial dangerous contraband has been discovered following virtual visits, including weapons, which would otherwise compromise the safety and security of the facility and all residents." *Id.* Against this backdrop, Plaintiffs have not shown that Defendants have "exaggerated their response" to the risks identified, and "deference must be given to the officials in charge." *Florence*, 566 U.S. at 328, 330.

Accordingly, Plaintiffs have not shown a likelihood of success on the merits with respect to searches following virtual visits.

*****

"As the Court concludes that Plaintiffs have not shown a likelihood of success on the merits, it does not address the remaining factors for preliminary relief." *New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562, 577 n.10 (S.D.N.Y. 2025) (citing *Pharaohs GC, Inc. v. U.S. Small*

---

[12] JOHN DOE 1 declares that, during his April 17, 2026 virtual visit, he "was alone in a room with a video monitor for *that* meeting." DOE 1 Decl. ¶ 5 (emphasis added). Based on the current record, the Court does not know when a resident might be "alone" as opposed to when the room might be "shared," *see* Ginsburg Decl. ¶ 34. *See, e.g.*, *Green v. Quiros*, 24 Civ. 1317 (VDO), 2026 WL 864165, at *8, *10 (D. Conn. Mar. 4, 2026) (finding no Fourth Amendment violation where "discovery ha[d] revealed" that "[p]laintiff was conducting his video visits in the same room as inmates conducting contact visits, where he could receive contraband from other inmates or visitors and bring it back into the housing unit irrespective of his ability to obtain contraband from his video visitors"), *appeal filed*, No. 26-865 (2d Cir. Apr. 6, 2026).

30

*Bus. Admin.*, 990 F.3d 217, 231–32 (2d Cir. 2021)); *Tzumi Innovations, LLC v. Regan*, 557 F. Supp. 3d 499, 510 (S.D.N.Y. 2021) (similar).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order is denied without prejudice.  The Clerk of Court is directed to terminate ECF No. 3.  By **July 6, 2026**, the parties shall file a joint letter proposing next steps.

SO ORDERED.

Dated: June 29, 2026
       New York, New York

_____
JENNIFER H. REARDEN
United States District Judge

31